**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-3319
_____

BEVERLY RIVERA,
Appellant

v.

COMMONWEALTH OF PENNSYLVANIA OFFICE OF THE ATTORNEY
GENERAL

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2:23-cv-00454)
District Judge:  Honorable John F. Murphy

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
November 13, 2025

Before: SHWARTZ, MATEY, and MONTGOMERY-REEVES, *Circuit Judges*.

(Opinion filed: January 9, 2026)
_____

OPINION*
_____

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

MONTGOMERY-REEVES, *Circuit Judge*.

Beverly Rivera was a Narcotics Agent with the Pennsylvania Office of Attorney General (the "OAG"). After she was fired, she sued the OAG, alleging that she suffered a hostile work environment and discriminatory termination in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and the Pennsylvania Human Relations Act (the "PHRA").[1] The District Court granted the OAG's motion for summary judgment. We agree and will affirm the District Court's judgment.

## I.     BACKGROUND

### A.     Rivera's Job Performance

Rivera, a Puerto Rican woman, began her position as a Narcotics Agent with the OAG on August 12, 2019. According to Rivera, things started out well.[2] But all agree that things changed, and OAG personnel began expressing serious concerns about Rivera's performance. In November 2020, a firearms instructor wrote that Rivera "struggled with

---

[1] Rivera also claimed she had suffered "retaliation" in violation of Title VII. App. 43. Because she did not brief the retaliation claim in the District Court or on appeal, we deem the claim abandoned. *See Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 145 (3d Cir. 2017) (holding that "an appellant's opening brief must set forth and address each argument the appellant wishes to pursue in an appeal").

[2] Rivera averred in her response to the OAG's Statement of Undisputed Material Facts that she received a positive performance review after her first year on the job. However, the document Rivera cites for that proposition appears to be a deposition exhibit that was not in the summary judgment record submitted to the District Court, and thus could not be considered by the court at summary judgment. *See Manetas v. Int'l Petrol. Carriers, Inc.*, 541 F.2d 408, 414 (3d Cir. 1976) ("Documents filed in support of a motion for summary judgment are to be used to determine whether issues of fact exist . . . .").

even the fundamentals of firearms" and noted "serious concerns with [Rivera's] gun handling and shooting abilities." Appendix (hereinafter "App. _") 221–22.

In March 2021, Rivera was placed on leave while the OAG's Office of Professional Responsibility (the "OPR") and Human Resources ("HR") department investigated new complaints about her conduct. One of Rivera's superiors, Regional Director Nehemiah Haigler, disclosed that Rivera wrote two investigative reports in the names of other officers—conduct that Haigler later testified he had not seen in his sixteen years at the OAG. Rivera admitted that she designated the two officers as the authors of the reports she wrote—though she claimed, with some corroboration, that those officers knew what she was doing. She also admitted that no supervisor approved the reports before she sent them to Karin Judge, the Deputy Attorney General prosecuting the case ("DAG Judge"), for production in discovery. Rivera's actions forced the OAG to dismiss at least one criminal case and make plea offers in at least two others.[3] After investigation, the OAG determined that Rivera had violated three OAG policies concerning "[c]ompetency," "[t]imely [r]eports," and "[a]ccurate [r]eports." *Id.* at 66–67.

---

[3] DAG Judge already had documented concerns about Rivera's case work. In February 2021, DAG Judge wrote a memorandum to a superior claiming that Rivera had given her search warrant inventories that were "riddled with errors and unclear references," including unexplained discrepancies and phrases like "numerous black plastic containing found in black bag inside trunk." App. 343. DAG Judge also claimed that Rivera had failed to include all pertinent information on a search warrant application and then had repeatedly asked DAG Judge to file a supplement to the application, even after DAG Judge explained to Rivera that supplementing a search warrant application post hoc is impossible. According to DAG Judge, Rivera then gave unhelpful testimony at a preliminary hearing in the same case.

In August 2021, an OAG employee named John Martinez completed a performance-evaluation form assessing Rivera's performance from August 2020 to August 2021. Martinez assessed that Rivera "[n]eed[ed] [i]mprovement" in every evaluative category and rated her overall performance "[u]nsatisfactory."[4]  *Id.* at 216–18.

Around the same time, HR began investigating complaints about Rivera's conduct on an undercover operation in a Philadelphia store.[5]  The investigation found that Rivera twice identified herself to individuals she knew personally.  Rivera also failed to respond to several attempts to contact her, failed to heed instructions to call a supervisor, and failed to exit the store when instructed.  Those actions compelled Rivera's supervisors to send in another agent to verify her safety.  Rivera told a supervisor that she did not want to leave the store because she was concerned someone would contact her grandmother, who lived in the neighborhood.

Although the HR investigation initially focused on Rivera's undercover work, its scope expanded to include an examination of "Rivera's ability to successfully perform the duties of her position as a Narcotics Agent."  *Id.* at 352.  The OAG determined that Rivera violated several policies, and the OAG's HR Director concluded that, although "Rivera seem[ed] to want to do a good job," Rivera did not "ha[ve] the required skill and/or ability

---

[4] Rivera did not receive this performance evaluation while the OAG investigated her conduct.  The OAG gave her Martinez's evaluation when it fired her, on August 30, 2022.

[5] Although it received the complaints in March 2021, HR had refrained from investigating while the OPR's investigation proceeded and, due to personnel issues, did not begin its own investigation until about two months after the OPR investigation concluded.

to be a Narcotics Agent at this time." *Id.* at 353. After Rivera rebuffed two settlement offers that would have required her resignation, the OAG fired her on August 30, 2022.

### B.     Rivera's Workplace Complaints

In September 2021—about six months after Rivera was placed on administrative leave, five months after the conclusion of the OPR investigation, and one month after the start of the HR investigation—Rivera lodged a written complaint about Martinez's workplace behavior. Rivera alleged that several incidents during the period from December 2020 to March 2021 caused her to feel belittled, humiliated, or otherwise uncomfortable.

Most notably, Rivera claimed that an agent named Stacey Rucker told her that Martinez asked Rucker whether Rucker and Rivera were dating. Allegedly according to Rucker, Martinez had also said to Rucker, "look at [another agent] trying to f[—] [Rivera]." *Id.* at 372.

Rivera also alleged that, during a January 2021 meeting with Martinez, Haigler, and another supervisor, Martinez used harsh language to assess Rivera's performance. According to Rivera, Martinez said: "[Y]ou have not been doing good on your reports and the last job you did was not good. You f[—]ed up. And you have to admit when you f[—] up. I am an old man and I admit when I f[—] up." *Id.* at 373. Martinez then allegedly asked what Rivera does at her computer and, with Haigler's encouragement, asked Rivera to attend a remedial report-writing class.

Finally, Rivera claimed that Martinez "blam[ed] [her] for everything," *id.*, referred to her in belittling tones in group conversations, made her feel like an outcast, and blocked

her from working on certain cases with certain agents, even though those agents asked to work with Rivera.

## C. Rivera's Deposition and Declaration

After the OAG fired her, Rivera filed this action for race and sex discrimination, which relies in significant part on the allegations in her workplace complaint. As would be expected in an employment discrimination suit, she was deposed. But, during her deposition, Rivera recalled very little about her allegations or other matters relevant to her claims.

For example, Rivera could not recall what her job responsibilities were, whether she had difficulty performing her job, whether she received annual reviews, whether she received "any negative feedback" during her employment with the OAG, *id.* at 134, whether Martinez ever made her feel like an outcast, whether she worked for DAG Judge, any information about the cases she worked on with DAG Judge, information about the remedial report-writing class she was instructed to attend and which she mentioned in her discrimination complaint, the firearms course she attended, when or why Martinez told her she could not work with a fellow agent, details about the undercover operation in which she entered the Philadelphia store, when she prepared her written discrimination complaint, or what she complained about.

Meanwhile, other OAG employees contradicted some of Rivera's allegations in their own depositions. For example, at her own deposition Rivera reiterated her allegation about what Rucker told her Martinez had said, but could not recall the substance or date of her conversation with Rucker. But Martinez and Rucker denied Rivera's allegation

6

outright. When asked about her meeting with Martinez and Haigler, Rivera could not recall the meeting at all, despite an attempt to refresh her recollection. But Martinez and Haigler denied that Martinez used profanity during their January 2021 meeting with Rivera.

With her summary judgment papers, Rivera supplied a declaration averring that during her deposition she "was stressed and overwhelmed to the point that [she] broke down in tears," which impaired her concentration and "caused [her] to suffer from a great deal of trauma and grief." *Id.* at 551. The declaration makes several additional claims about the firearms training course in which Rivera participated, the reports she authored in other agents' names, her report-writing competency, her interactions with DAG Judge, and her unrequited effort to connect with a potential mentor at Haigler's suggestion. Rivera attached to the declaration several emails and other documents generally relating to those matters.

## II. DISCUSSION[6]

The District Court granted summary judgment for the OAG. On appeal, Rivera argues that genuine issues of material fact precluded summary judgment on her Title VII

---

[6] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have jurisdiction under 28 U.S.C. § 1291. We review *de novo* a District Court's disposition of a motion for summary judgment, "meaning we review anew the District Court's summary judgment decisions, applying the same standard it must apply." *Ellis v. Westinghouse Elec. Co.*, 11 F.4th 221, 229 (3d Cir. 2021). "To prevail on a motion for summary judgment, the moving party must demonstrate 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Rivas v. City of Passaic*, 365 F.3d 181, 193 (3d Cir. 2004) (quoting Fed. R. Civ. P. 56(c)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Any "inferences to be drawn from the underlying

and PHRA claims for a hostile work environment and discriminatory termination.[7]

"Claims under the [PHRA] are interpreted coextensively with Title VII claims." *Nitkin v. Main Line Health*, 67 F.4th 565, 569 n.1 (3d Cir. 2023) (quoting *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006)). Thus, for simplicity, and because there are no relevant differences between federal and state law on these issues, we focus on Rivera's Title VII hostile workplace and discrimination claims. Our reasoning applies equally to her PHRA claim.

## A. Hostile Work Environment

Title VII prohibits employers from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] race, color, . . . [or] sex." 42 U.S.C. § 2000e-2(a)(1). That includes race-based discrimination and "[s]exual harassment that creates a hostile work environment." *Starnes v. Butler Cnty. Ct. of Common Pleas*, 971 F.3d 416, 428 (3d Cir. 2020) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *Castleberry v. STI Corp.*, 863 F.3d 259, 265 (3d Cir. 2017). Discrimination or harassment creates a hostile workplace if it is

---

facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and alterations omitted).

[7] Although Rivera's Opening Brief is not a model of clarity, we conclude that she has forfeited any challenge to the District Court's disposition of her § 1981 claim. She trains her arguments on the District Court's analyses of her claims for race and sex discrimination under Title VII and the PHRA, but does not address the court's reasons for granting summary judgment on the § 1981 claim. We therefore deem her § 1981 claim abandoned. *See Barna*, 877 F.3d at 145.

"sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (alterations omitted) (quoting *Meritor*, 477 U.S. at 67); *Castleberry*, 863 F.3d at 265.

The pervasiveness and severity of alleged conduct "must be judged 'by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."'" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)); *see also Mandel*, 706 F.3d at 168 (stating that a court must consider the totality of the circumstances). For Rivera to prevail, she must have endured "an objectively hostile or abusive work environment," not merely one that she subjectively found hostile or abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

Rivera does not clear that bar. She details only two incidents credibly tinged with animus based on her status as a Puerto Rican woman: Martinez's statement to Rucker about another agent trying to sleep with Rivera, and Martinez's question about whether Rucker and Rivera were dating. Assuming these incidents occurred—without corroboration in the record and against Martinez's and Rucker's denials—they were isolated and do not suggest any change in the terms and conditions of Rivera's employment. *See Breeden*, 532 U.S. at 271 ("[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (quotation omitted)). Martinez's comments, in other words, do not show that Rivera's "workplace [was] permeated with

9

'discriminatory intimidation, ridicule, and insult.'" *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 65); *compare Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 182 (3d Cir. 2020) (isolated references to Egyptian employee as "Arabia Nights," "Big Egypt," and "Mufasa" or "Mufasa Ali" were not "so pervasive that they altered the working environment"), *with Castleberry*, 863 F.3d at 265 (finding racial epithet followed by threat of termination sufficiently "extreme" to constitute a hostile work environment).

Rivera's other allegations, even if true, do not evince discriminatory animus and, in any event, were insufficiently severe or pervasive to support a hostile-work-environment claim. We credit Rivera's claims that she genuinely felt "humiliated," "overwhelmed," "belittled," "confused," or otherwise "like an outcast." App. 372–74. But the assignments, questions, and feedback Rivera alleged reflect, at most, a manager who was frustrated with her. They were not "sufficiently 'severe or pervasive' that a reasonable person" with Rivera's protected characteristics "would [have found] the conditions of employment altered." *Ali*, 957 F.3d at 182.

Similarly, Martinez's alleged admonition that Rivera needed to "admit when [she] f[—][ed] up," App. 373, and subsequent comments about Rivera's computer use and report-writing might have been "offensive utterance[s]" in Rivera's view, but that is not enough. *Breeden*, 532 U.S. at 271. Rivera has not created a reasonable dispute that Martinez's comments were tainted with discriminatory language or discriminatory motivation. To the contrary, Martinez's remarks were consistent with what the District Court accurately described as Rivera's "well documented" poor performance. *Rivera v. Off. of Att'y Gen.*, No. 2:23-cv-00454, 2024 WL 4771388, at *11 (E.D. Pa. Nov. 13, 2024).

10

We thus agree with the District Court that the OAG was entitled to summary judgment on Rivera's hostile-work-environment claim.[8]

## B.    Discriminatory Termination

Title VII prohibits employers from "discharg[ing] any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Rivera concedes that she has no direct evidence of discrimination, and, as a result, we apply the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). *Burton v. Teleflex Inc.*, 707 F.3d 417, 425–26 (3d Cir. 2013). Under *McDonnell Douglas*'s first step, a plaintiff must establish a prima facie case of discrimination. *Id.* at 426. "Once the plaintiff makes out her prima facie case, 'the burden of production [then] shifts to the defendant to offer a legitimate non-discriminatory [justification] for the adverse employment action.'" *Id.* (alterations in original) (quoting *Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir. 2009)). If the employer provides a legitimate, nondiscriminatory reason for its action, the burden of production "shifts . . . back to the plaintiff to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Id.*

Even if Rivera could make out a prima facie case of discrimination, the OAG has proffered legitimate, non-discriminatory justifications for terminating Rivera's employment, namely that she violated OAG policies regarding performance of duty,

---

[8] Because we affirm on this ground, we need not address, as the District Court did, whether there was a genuine dispute about Rivera's ability to show *respondeat superior* liability.

11

competency, lawful order, reporting for duty, and filing timely and accurate reports. To show that these reasons were pretextual, Rivera must submit evidence that (1) "meaningfully throw[s] into question, i.e., [casts] substantial doubt upon, the [employer's] proffered reasons," or (2) "from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Rivera has failed to do so.

First, although Rivera claims that she received favorable reviews in undercover investigations and that others had to attend a writing course, those claims do not cast doubt on the OAG's reasons for terminating her employment, and she fails to offer any evidence to prove that the reasons the OAG offered were inaccurate. In fact, Rivera conceded that she broke cover during an investigation by speaking to someone she personally knew and that she placed other agents' names on reports that she prepared. Even if she did present evidence showing the OAG was wrong about her violations of its policies or about whether those violations warranted termination, Rivera "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999) (citation omitted).

Second, Rivera cannot show that the OAG's proffered reasons for terminating her were pretextual. "[T]o survive a motion for summary judgment in a pretext case, the plaintiff must produce 'sufficient evidence to raise a genuine issue of fact as to whether the

12

employer's proffered reasons were not its true reasons for the challenged employment action.'" *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 504 (3d Cir. 1997) (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996)). Although a plaintiff can show that an employer's proffered legitimate reason was pretextual by, for example, "showing . . . that the employer treated other, similarly situated persons not of [her] protected class more favorably," *Fuentes*, 32 F.3d at 765, Rivera has offered no evidence that Martinez treated her differently because of her race or sex. In fact, during her deposition, she could not recall any incidents of Martinez treating her differently based on her race or sex, and she identified no other evidence that she was treated differently based on her race or sex.

Because Rivera failed to show that the OAG's decision to terminate her employment was pretextual, the District Court did not err in granting the OAG summary judgment on her claim that she was terminated based on her race or sex.

## III. CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgment.